UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AMERICAN STATES INSURANCE COMPANY,

Plaintiff,

v.

INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,

Defendant.

No. 2:12-cv-01489-MCE-AC

**MEMORANDUM AND ORDER**

On March 23, 2016, this Court issued its Memorandum and Order (ECF No. 156) granting the Motion for Summary Judgment (ECF No. 85) filed by Plaintiff American States Insurance Company ("American States" or "American") on grounds that Defendant Insurance Company of the State of Pennsylvania ("ICSOP") had a primary duty to defend its insured, Sierra Pacific Industries ("Sierra"), in various lawsuits arising from the so-called "Moonlight Fire."[1] The Court concurrently denied ICSOP's correspondingly heard Motion for Summary Judgment (ECF No. 99).[2] Having

---

[1] The Memorandum and Order was amended on March 23, 2017, to correct two inadvertent typographical orders which did not alter the substance of the original Order.

[2] Federal jurisdiction over this matter is pursuant to diversity of citizenship in accordance with 28 U.S.C. § 1332. As such, the substantive claims raised by the instant lawsuit are governed by the law of the forum state, here California. See Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).

1

established ICSOP's primary duty to defend, American States moved for summary judgment on its remaining equitable contribution claim, arguing that ICSOP should pay the fees and costs it incurred in defending Sierra based on the respective policy limits of the ICSOP and American policies.[3] By Memorandum and Order filed May 23, 2017 (ECF No. 177), this Court denied American's motion on grounds that the policy limits approach advocated by American was not the most equitable way to apportion defense costs between American and ICSOP. The Court further noted that apportioning contribution based on the alleged relative fault of American and ICSOP's respective insureds was not proper, either. Nonetheless, the Court invited the parties to file an additional summary judgment motion based on "another recognized equitable apportionment method" for allocating the fees and costs borne by American States in defending Sierra. Now before the Court are additional motions in that regard filed on behalf of both American and ICSOP, which have been fully briefed by the parties. For the reasons that follow, American's Motion for Summary Judgment (ECF No. 182) is GRANTED to the extent that the court awards $6,613,957.28 in equitable contribution in American's favor, but DENIED with respect to American's request for prejudgment interest. ICSOP's corresponding Motion for Summary Judgment (ECF No. 184) is DENIED.

## BACKGROUND

The underlying facts of this matter have already been outlined in the Court's previous Orders. Sierra was a named defendant in various lawsuits arising from a September 2007 wildfire in Plumas County, California, commonly referred to as the "Moonlight Fire." American States agreed to defend Sierra in those lawsuits, beginning

///

---

[3] Alternatively, American States made a nearly identical argument that the Court summarily adjudicate the issue of whether any equitable contribution here be governed by a policy limits analysis.

2

in September of 2009, pursuant to a Commercial General Liability ("CGL") policy it had issued to Howell's Forest Harvesting.

By way of background, after Sierra obtained rights to harvest timber on a Plumas County parcel of land, Sierra hired Howell to perform certain operations on that land under the terms of a logging agreement. The logging agreement required Howell to obtain CGL insurance and to name Sierra as an additional insured under the resulting policy.

By July 2007, American States had issued CGL insurance to Howell with a $1 million coverage limit. Plaintiff American's Statement of Undisputed Facts ("PUF"), No. 22. In accordance with the logging agreement, Sierra was included as an additional insured under a "Liability Plus Endorsement" page stating that an insured under the CGL policy includes "[a]ny person or organization . . . for whom you are required by written contract, agreement[,] or permit to provide insurance." Id. at No. 30. The insurance coverage for Sierra as an additional insured, however, applied "only to the extent [Howell] [is] held liable due to: . . . [Howell's] ongoing operations for [Sierra]." Id. Thus, while there is no dispute that Plaintiff's coverage for Sierra was primary in nature, it was limited to Sierra's vicarious liability as to Howell, and Sierra's independent liability was not covered under Plaintiff's CGL Policy with Howell. In addition to its primary CGL policy, American also issued a $1 million commercial umbrella policy, with its primary policy being the scheduled underlying insurance for the umbrella coverage. Id. at Nos. 27-28.

In October 2006, ICSOP issued a commercial umbrella insurance policy to Sierra that provided both primary and excess coverage in the amount of $10 million. ICSOP's policy for Sierra delineated its duty to defend as follows:

> [ICSOP] shall have the right and duty to defend any claim or suit . . . when:
>
> (a) The applicable limits of insurance of . . . any . . . underlying insurance . . . [have] been exhausted by payment of claims or suits to which this Policy applies; or

3

> (b) Damages are sought for . . . property damage . . . covered by this Policy but not covered by . . . any other underlying insurance providing coverage to [Sierra].

Id. at No. 20

Consequently, under clause (a), ICSOP's umbrella policy provided excess insurance when Sierra was vicariously liable with Howell and Plaintiff's policy limits were exhausted by payment of claims. Additionally, ICSOP's umbrella policy provided primary coverage under clause (b) for property damage arising from Sierra's non-vicarious liability.

In September 2007, "Howell employees were allegedly operating bulldozers . . . pursuant to the [l]ogging [a]greement [with Sierra]," when a fire ignited nearby that "eventually burn[ed] approximately 65,000 acres in the area." Pl.'s Third Am. Compl., ¶ 8. Sparks caused by Howell's bulldozers allegedly caused the conflagration and the resulting Moonlight Fire. Multiple lawsuits were filed against both Sierra and Howell as a result of the fire, all of which Sierra tendered to both American States and ICSOP. American accepted Sierra's defense in all of the fire-related lawsuits "without a reservation of rights to deny coverage for any damages awarded against Sierra, subject to available policy limits and California law . . . ." Id. at ¶ 26. Thus, American agreed to defend and indemnify Sierra for not only suits where Sierra was vicariously liable with Howell—which was covered under Plaintiff's CGL policy—but also where Sierra was independently liable.

Because American State's CGL policy only covered Sierra for vicarious liability with Howell, however, Sierra took the position that American States had a conflict of interest in defending Sierra despite its agreement to provide a defense without reservation. As a result of this conflict, Sierra argued it was entitled to independent counsel pursuant to California Civil Code § 2860. Sierra maintained this stance throughout the lifetime of the fire-related lawsuits—despite the fact that Plaintiff accepted defense of the lawsuits without reservation—and Sierra obtained outside counsel, the law firm of Downey Brand, for its defense. While American States agreed to pay

4

Downey Brand at the rates it was prepared to pay counsel it had selected to defend Sierra, American declined to pay anything in addition to those prevailing rates. At no time did ICSOP defend or attempt to defend Sierra in any of the fire-related lawsuits.

On or about July 17, 2012, the fire-related suits against Sierra settled, exhausting both American States' and ICSOP's respective policy limits. ICSOP also ultimately settled Sierra's claim that it wrongfully refused to provide Sierra with a defense by contributing some $3,444,260.84 towards the cost of Sierra's independent counsel, over and above the sums that American States already paid Downey Brand for Sierra's defense. See PUF No. 52. American States and Sierra also settled any remaining claims against each other, with Sierra acknowledging that American had paid some $5,380,365.75 in legal fees and expert costs of $7,847,548.81 for total fees paid of $13,227,914.56. Id. at No. 56.

As indicated above, American States made its own claim against ICSOP for equitable contribution towards the defense costs American States had assumed and filed the present lawsuit on June 1, 2012. Once this Court determined that ICSOP had a primary duty to defend Sierra by Memorandum and Order filed March 23, 2016, the only claim remaining is for equitable contribution in determining the extent of ICSOP's indebtedness for Sierra's defense. American's initial motion for summary judgment, which argued for an allocation based on policy limits that would attribute some 90 percent of its fees and costs to ICSOP, was denied. In addition, ICSOP's argument in opposition, that allocation be based on the relative fault of the parties, was also rejected as both unworkable and contrary to sound public policy. The proper method for effectuating equitable contribution continues to be the subject of the motions now before the Court, which it authorized after having denied American's previous motion.

///

///

///

///

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

///

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

### A. Principles Underlying Equitable Contribution

As indicated above, American States seeks equitable contribution from ICSOP, as sought in its Fourth Claim for Relief, on grounds that ICSOP shared a primary duty to defend Sierra in the Moonlight Fire lawsuits, yet failed to assume that duty at any time prior to the settlement reached in July of 2012 whereby both carriers paid their respective policy limits in order to resolve those lawsuits. By previous Memorandum and Order filed May 23, 2017, the Court rejected ICSOP's various defenses to equitable contribution, having determined that 1) American States was not a party to the logging agreement between Sierra and Howell in which Howell agreed to indemnify ICSOP's insured, Sierra; 2) the terms of American's policy do not govern the potential sharing of defense costs; and 3) satisfaction of the ICSOP policy's self-insured retention has no bearing on contribution. Consequently, the Court found that principles of equitable contribution do apply in apportioning Sierra's defense costs between American and ICSOP, both of whom owed a primary duty to defend their mutual insured.

The right to equitable contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has either paid more than its share of the claim in question or defended the action without participation from the other carrier or carriers obligated to do so. Equitable contribution permits reimbursement

7

to the carrier paying in excess of its proportionate share of the obligation in question, and serves the equitable objective of equalizing the common burden shared by coinsurers and preventing one insurer from profiting at the expense of others. Scottsdale Ins. Co. v. Century Surety Co., 182 Cal. App. 4th 1023, 1031 (2010).

California law does not impose any fixed method for allocating defense costs between insurers. Instead, any determination in that regard is subject to the court's sound discretion in achieving just apportionment:

> [A] trial court must determine which method of allocation will most equitably distribute the obligation among the insurers pro rata in proportion of the risk, as a matter of distributive justice and equity. As such, a trial court's determination of which method of allocation will produce the most equitable results is necessarily a matter of its equitable judicial discretion.

Id. at 1032; see also Truck Ins. Exch. v. Unigard Ins. Co., 79 Cal. App. 4th 966, 974 (2000) (In determining contribution courts have broad discretion to "consider the nature of the claim, the relation of the insured to the insurers, the particulars of each policy and any other equitable considerations.")

There is consequently no "correct" or even "preferred" method of allocating defense costs between coinsurers. "The reason for the courts' refusal to establish such a bright-line rule is the existence of differing factual circumstances varying from case to case, which unavoidably give rise to different equitable considerations that must be taken into account." Centennial Ins. Co. v. U.S. Fire Ins. Co., 88 Cal. App. 4th 105, 116 (2001); see also Axis Surplus Ins. Co. v. Glencoe Ins. Ltd., 204 Cal. App. 4th 1214, 1231-32 (2012). Hard and fast rules on allocating costs between multiple insurers should be avoided because of the "varying equitable considerations which may arise, and which affect the insured and the . . . carriers, and which depend upon the particular policies of insurance, the nature of the claims made, and the relation of the insured to the insurers." CNA Cas. of Calif. v. Seaboard Sur. Co., 176 Cal. App. 3d 598, 619 (1986), citing Signal Cos. , Inc. v. Harbor Ins. Co., 27 Cal. 3d 359, 369 (1980).

///

In order to address these various concerns, courts have adopted a number of different ways of reapportioning defense costs between participating and non-participating insurers. Those approaches include: 1) time on the risk; 2) policy limits; 3) combined time on the risk and policy limits; 4) premiums paid; 5) maximum loss; and 6) equal shares. Scottsdale, 182 Cal. App. 4th at 1032.

As indicated above, by its Memorandum and Order filed May 23, 2017, the Court denied American's request for summary adjudication as to equitable contribution based on a policy limits approach. The Court further rejected ICSOP's suggestion, made in opposition to American's motion, that contribution, if indicated at all, should be determined under a "relative fault" analysis. The Court reasoned that ICSOP's proffered suggestion is not only not recognized by Scottsdale, but has also been expressly rejected by other California decisions as contrary to the principles underlying equitable contribution. See, e.g., Fire Ins. Exch. v. Am. States Ins. Co., 39 Cal. App. 4th 653, 663 (1995); Hartford Acc. & Indem. Co. v. Superior Court, 29 Cal. App. 4th 435, 440 (1994). As Scottsdale observed, "[e]quitable contribution does not depend on fault; it is based on an equitable apportionment of contractual undertakings." Scottsdale, 182 Cal. App. 4th at 1033. Indeed, predicating equitable contribution on comparative fault would run counter to sound public policy since such an approach "would hamper settlements and require the defendant to prove its own fault before the defendant's insurer could seek equitable contribution." Fire Ins. Exch., 39 Cal. App. 4th at 663.

While rejecting both approaches advocated by the parties in American's initial summary judgment motion as to equitable contribution, as indicated above the Court nonetheless invited the parties to file an additional summary judgment motion on grounds that another recognized equitable apportionment method should apply in determining ICSOP's share of the fees and costs borne by American States in defending Sierra. Both American and ICSOP have now filed competing motions in that regard.

///

///

As a preliminary matter, the starting number subject to equitable apportionment appears to be beyond dispute. American States had paid some $5,380,365.75 in legal fees and expert costs of $7,847,548.81 for total fees paid of $13,227,914.56. PUF No. 66. American alone provided a defense to Sierra in the Moonlight Fire actions. It is well established under California law that an insurer like ICSOP who refuses to participate in defending its insured waives any right to challenge the reasonableness of those defense costs paid by its co-insurer, here American States. As the court in <u>Safeco Ins. Co. of Am. v. Superior Court</u>, 140 Cal. App. 4th 874 (2006) observed:

> When a duty to defend is shown, nonparticipating coinsurers are presumptively liable for both the costs of defense and settlement. (E.g. <u>Travelers Casualty & Surety Co. v. Century Surety Co.</u> (2004) 118 Cal. App. 4th 1156, 1159 [ ]; <u>Century Surety Co. v. United Pacific Ins. Co.</u>, (2003) 109 Cal. App. 4th 1246, 1260 [ ]; <u>Fireman's Fund Ins. Co. v. Maryland Casualty Co.</u>, (1998) 65 Cal. App. 4th 1279, 1307-1309 [ ].) On the more precise issue of just how much the nonparticipating coinsurer has to pay, the courts have held that, **by its refusal to participate, the recalcitrant coinsurer waives the right to challenge the reasonableness of defense costs** . . . (<u>United Services Automobile Assn. v. Alaska Ins. Co.</u> (2001) 94 Cal. App. 4th 638, 644 [ ]; <u>American Star Ins. Co. v. Insurance Co. of the West</u>, [232 Cal. App. 3d 1320, 1332-1333 (1991)]; Croskey et al., Cal. Practice Guide: Insurance Litigation [(The Rutter Group 2005)], ¶¶ 8:67.20 to 8:67.22, pp. 8-29 to 8-30.

<u>Id.</u> at 880 (emphasis added).

Consequently, having failed to defend Sierra over a three-year period when American did so at a cost of more than $13 million, ICSOP cannot now question the necessity, extent or reasonableness of those expenditures in an equitable contribution action like this one given its refusal to provide a defense. In any event, American scrutinized the invoices it received from Sierra's independent counsel, Downey Brand, and paid only those costs that it determined were reasonable and necessary to Sierra's defense. See PUF No. 57. Significantly, too, when ICSOP negotiated a release of Sierra's bad faith failure to defend the case by paying an additional $3.4 million of Downey Brand's fees over and above those fees already paid by American States, it relied on American's evaluation as to the propriety of the Downey Brand invoices, (<u>id.</u> at

Nos. 52-53), a factor which also weighs against any further scrutiny as to those expenses. It follows that the starting point for calculating contribution would appear to be the total expenditure of $13,227,914.56 incurred by American in defending Sierra.

### B.   Reduction of Sierra's Defense Costs as Benefitting Howell

ICSOP now argues that amounts expended by American should be reduced by as much as 75 percent on grounds that American's payments to Downey Brand for Sierra's defense were, at least in part, directed to the defense of Howell and its employees who were not ICSOP insureds. According to ICSOP, Downey Brand entered into a "joint defense agreement" with the Howell defendants' counsel, as a result of which Downey Brand undertook the vast majority of work necessary for Howell's defense. ICSOP argues that holding it responsible for any such additional expense would be inequitable.

The Court disagrees. The evidence shows that Sierra controlled its own defense in this matter, having hired Downey Brand after refusing to relinquish such control to American. PUF No. 45; <u>see also</u> American's Additional Undisputed Fact ("AUF") (ECF No. 189), No. 138.   While the parties did enter into a joint defense agreement, that agreement said nothing about Sierra taking any "lead" in the defense, or about joint retention of experts or cost sharing, and was designed to protect communications between the co-defendants' counsel and their clients under the attorney-client privilege and the attorney work product doctrine. AUF Nos. 129-134.

American was accordingly not responsible for the manner in which Downey conducted the litigation. Moreover, in addition to retaining Downey Brand, Sierra hired its own experts, consultants, and other vendors. ICSOP has not cited to any authorization by Howell, or its counsel, that Downey Brand appear for, or otherwise represent, Howell.[4]   Absent such authorization, there is no entitlement to payment for attorney fees allegedly incurred by counsel for another, allegedly benefitting, party. See,

---

[4] The fact that William Warne, the lead Downey Brand attorney representing Sierra, suggested that Downey Brand "took the lead" in defending against the government's claims in the Moonlight Fire cases does not mean that there was any authorization or agreement by Howell (or American) that he do so or that Downey Brand or Sierra's experts could act on Howell's behalf.

11

e.g., Preston v. U.S., 284 F.2d 514, 516 (9th Cir. 1960). Additionally, given the fact that Sierra faced independent liability exposure on its own apart from any vicarious liability it had for Howell's actions, Downey Brand could not represent both Sierra and Howell and did not do so. AUF No. 139. Speculation as to the extent that Howell may have benefitted from the work of Sierra's defense counsel and experts cannot serve as a basis for reducing ICSOP's contribution towards costs incurred in defending Sierra as its joint insured, particularly since American hired separate defense counsel to represent Howell, who, in turn, hired separate consultants and experts[5] on Howell's behalf. AUF Nos. 120, 136.[6] Finally, and most significantly, having refused to defend Sierra, the Court has already determined that ICSOP has waived the right to challenge the reasonableness of the more than $13 million American paid in defense costs. ECF No. 177, 10:23-26.

ICSOP's reliance on Buss v. Superior Court, 16 Cal. 4th 35 (1997) to support a different result is misplaced. While Buss permitted a defending insurer, which reserved its right as to the scope of its duty in that regard, to recoup defense costs it proved were solely incurred in the defense of uncovered claims, no such situation is present in the instant matter, where ICSOP declined its defense obligation entirely. See id. at 49-53. Buss accordingly does not hold that a non-defending insurer like ICSOP is entitled to any reduction in defense costs under circumstances akin to those involved here, let alone a reduction based on some speculative benefit that the Howell defendants allegedly received from Downey Brand's defense.

///

///

---

[5] Prognosticating at this point about what experts were necessary in defending Sierra, as opposed to the Howell defendants, is an all but impossible task. Additionally, despite ICSOP's apparent argument otherwise, relatively exposure under various legal theories cannot be determined by the number of experts retained on any given topic.

[6] Although Howell and the other defendants sued as a result of the Moonlight Fire agreed to split some costs, (AUF Nos. 135-137), only Sierra's share of those invoices is included within the defense costs. AUF Nos. 137, 140.

**C.     Reducing Sierra's Defense Costs Based on Causes of Action Pled**

Having determined that ICSOP is not entitled to an off-the-top reduction to the defense costs incurred by American in Sierra's defense based on an argument that Howell somehow benefitted from a portion of those costs, the Court next turns to ICSOP's claim that its share of American's defense costs for Sierra should also be reduced based on the relative ratio of the total causes of action pled against Sierra in the underlying Moonlight Fire lawsuits versus those claims which included vicarious liability components.

According to ICSOP, because only 12 of 44 causes of action were based exclusively on Sierra's potential independent liability, a proration of 12 to 44 (or 27.27 percent) should be applied prior to allocating any defense costs between ICSOP and American.  In attempting to quantify potential liability in this manner, however, ICSOP tries to revisit its previous argument concerning relative fault, and this Court already rejected that approach in its previous May 23, 2017 Memorandum and Order.  As the Court noted in that Order, 1) "relative fault" is not a recognized allocation method; 2) it runs contrary to the principles underlying equitable contribution and sound public policy; and 3) it would, as a practical matter, impose an undue burden on the Court in either being forced to essentially try the underlying claims, or at a minimum guess as to the likely outcomes.  See ECF No. 177, pp. 13-14.  ICSOP's present attempt to apportion defense costs based on the numbers of causes of action asserted against Sierra simply repackages the previously dismissed "relative fault" approach, and must be rejected on that basis.

In addition, no case law recognizes ICSOP's proposed equitable allocation method based on "cumulative" causes of action.  To the contrary, as the Court has already noted, any approach based on comparative fault runs counter to relevant California law.  See Fire Ins. Exch. v. Am States Ins. Co., 39 Cal. App. 4th  at 663 (noting the lack of any "California authority holding that equitable contribution requires a specific finding of each insured's comparative fault" and recognizing that "[s]uch a rule

13

1 would hamper settlements and require the defendant to prove its own fault before the
2 defendant's insurer could seek equitable contribution."); Scottsdale Ins. v. Century
3 Surety Co., 182 Cal. App. 4th at 1033 ("Equitable contribution does not depend on fault;
4 it is based on an equitable apportionment of contractual undertakings.").[7]

5 Perhaps most tellingly, as American points out, apportioning costs based on the
6 sheer number of causes of action pled is illogical since, regardless of whether Sierra had
7 to defend against one cause of action based on independent liability, or 44 different
8 causes of action in total,[8] its overall exposure remained the same with more than $1
9 billion in total damages sought as a result of fire damage.[9] Because the number of
10 causes of action pled does not alter that exposure, apportioning defense costs on that
11 basis simply makes no sense.

### D. Duty to Defend Under American's Umbrella Policy

13 ICSOP next argues that if an "equal shares" apportionment of defense costs is
14 considered by the Court, the total sum to be split should be divided by three ways.
15 According to ICSOP, American's umbrella policy must be deemed a third policy
16 providing a defense obligation, and that therefore it would be improper to split the costs
17 equally between American and Sierra should the equal shares method be employed.
18 Again, the Court concludes ICSOP's argument is misplaced.

---

[7] The cases ICSOP cites to support their contrary position are inapposite. Transcontinental Ins. Co. v. Ins. Co. of State of Penn., 148 Cal. App. 4th 1296 (2007) involves, the "entirely different" concept of equitable subrogation as opposed to the equitable contribution involved here. Id. at 1303. St. Paul Mercury Ins. Co. v. Mountain West Farm Bureau Inc. Co., 210 Cal. App. 4th 645 (2012) did not allocate defense costs based on the number or nature of causes of action asserted, as ICSOP advocates here, but instead used an entirely different time-on-the-risk method of allocation. Id. at 652-53; 662-664. Finally, First Mercury Ins. Co. v. Great Divide Co., 241 F. Supp. 3d 1028 (N.D. Cal. 2017) applied an "equal shares" method to allocate defense costs. Id. at 1039.

[8] It must also be observed that ICSOP's attempt to characterize 32 of the 44 causes of action as "inherently vicarious", and consequently not coming within the purview of its coverage, is problematic at best. Many of those claims also hinged, at least in part, on independent liability or, at the very least, contained "mixed" allegations combining both independent and vicarious liability. This highlights the practical impossibility of apportioning equitable contribution on that basis.

[9] In addition, the Court cannot discount Sierra's potential independent liability exposure in any event, based on its alleged negligent hiring and supervision of Howell, particularly since the extent to which Sierra could delegate is non-delegable duties to Howell, and whether Howell in fact acted as an "independent contractor" for Sierra, remained in fundamental dispute. AUF Nos. 60-62.

According to ICSOP, America's umbrella policy was co-primary with the ICSOP policy for claims asserted against Sierra based on its independent liability. The fact that the American umbrella policy ultimately provided coverage for Sierra, whether for independent or vicarious liability, however, does not mean that its provisions triggered a defense obligation. This is because under its express terms, the American umbrella policy provides for a defense only "against a claim that alleges damages arising out of an 'occurrence,' which is not covered, in whole or in part, under 'scheduled underlying insurance' or 'unscheduled underlying insurance' . . . which seeks damages arising out of an 'occurrence' otherwise covered under this policy." Defendant ICSOP's Statement of Undisputed Facts. ECF No. 184-1 ("SUF"), No. 31. The limiting phrase "in whole or in part" is determinative since American's primary policy does provide "scheduled underlying insurance" (id. at No. 28) that undisputedly covered Sierra's potential liability "in part" by covering Sierra's vicarious liability for Howell's conduct.[10] Fundamental principles of insurance policy construction require that policy terms cannot be read "in such a way that would render some of its words meaningless." Collin v. Am. Empire Ins. Co., 21 Cal. App. 4th 787, 818 (1994). Applying those principles here means that the American umbrella policy provides no duty to defend.

ICSOP's "other insurance" clause, on the other hand, is silent as to the duty to defend, except to the extent it provides no such duty where its coverage is excess. See PUF No. 20; AUF No. 115. In the present case, however, the ICSOP policy was not issued as excess over a primary policy or self-insured retention. Absent such underlying insurance, as the Court has already determined, American's umbrella policy became for all practical purposes a primary policy that had to "drop down" and provide a defense to Sierra for claims that alleged Sierra's independent liability. Additionally, the ICSOP

---

[10] The ICSOP policy, on the other hand was not "underlying scheduled insurance" because it was not identified in the American umbrella policy schedule of underlying insurance. Nor can it be deemed to be "underlying unscheduled insurance" since the American umbrella policy defines that term as "any insurance policies available to you…", with "you" being defined only as the named insured under the American policy, Howell. Because the ICSOP policy was not issued to Howell, it could therefore not qualify as "'underlying unscheduled insurance" to the American umbrella policy issued to Sierra.

1 policy contains no limitation on the duty to defend like that set forth in the American umbrella policy.[11]  Consequently, American's umbrella policy is irrelevant in assessing the defense obligations at play in the instant matter.

### E. Application of "Equal Shares" Approach

Having rejected ICSOP's arguments as to why an "equal shares" approach between it and American should not be employed in this instance, the Court now looks to whether that approach should be applied here.[12]  As a co-primary insurer with American States under the circumstances of this case, ICSOP had an independent, concurrent obligation together with American to afford Sierra a complete defense in the Moonlight Fire lawsuits.  See, e.g., Buss v. Superior Court, 16 Cal. 4th at 48 (when an insurer has a contractual duty to defend its insurer against at least one claim in a lawsuit, it must provide and fund a defense of the entire action).

Here, despite the fact that ICSOP alone covered Sierra's potential independent liability, American alone defended Sierra to the tune of over $13 million over a three-year period.  PUF at No. 56.  As already recognized by the Court, other equitable approaches authorized by the case law would result in ICSOP paying more than 90 percent of the defense costs incurred by American in Sierra's defense.  While the Court determined that a ratio skewed to that extent was not equitable under the circumstances, the same cannot be said for an equal shares approach which simply splits the costs incurred down the middle.  The latter approach acknowledges the fact that there is no basis, beyond speculation, for doing otherwise given the fact that no conclusive determination of

---

[11] The fact that the $10,000,000 ICSOP policy was ostensibly issued as an umbrella policy is of no moment since, as indicated above, it was issued in the absence of a scheduled underlying policy.  See Carmel Dev. Co. v. RLI Ins. Co., 126 Cal. App. 4th 502, 514 (2005) (how a policy happens to be labelled is "not dispositive; it is the policy language that controls the attachment of coverage").  While ICSOP argues strenuously that, as an umbrella carrier, it should not be expected to assume a full defense burden, it cites no authority for the proposition that once its duty to defend as a primary carrier is triggered, it should pay less than any other primary carrier.

[12] Other apportionment approaches as identified by Scottsdale either have already been implicitly rejected by the Court (the "time on the risk and policy limits" formula would operate the same as the already rejected "policy limits" approach) or are inapplicable (a "premiums paid" formula would result in ICSOP being responsible for some 98 percent of defense costs).  Additionally, "time on the risk" alone would result here in the same even split called for by the "equal shares" method.

16

liability was made, or ever will be ascertained. Moreover, assigning ICSOP anything less than a full equal share of costs incurred would, in essence, reward the company for its recalcitrance in not providing a defense earlier despite the fact that it operated as the functional equivalent of a $10 million primary CGL policy for Sierra's domestic operations at issue in the Moonlight Fire actions. Even if, as ICSOP argues, a typical umbrella insurer provides greater coverage limits towards settlement or judgment along with a reduced expectation of defense costs, ICSOP was not a typical umbrella carrier here since its policy dropped down and provided primary coverage given the lack of any underlying insurance. Under those circumstances it is not reasonable for ICSOP to argue it had a reduced expectation for bearing defense costs.

The Northern District's recent decision in First Mercury Ins. v. Great Divide Ins. Co., 241 F. Supp. 3d 1028 (N.D. Cal. 2017) supports this conclusion in applying an equal share apportionment of defense costs in a case with similarities to this one. In First Mercury, Plaintiffs, who were injured in a physical assault that occurred as they waited in a restroom line at a football stadium, sued both the stadium security company, a number of San Francisco Forty-Niners entities, and the City of Santa Clara. First Mercury, the CGL carrier for the stadium security company, defended all the defendants, to the extent they qualified as additional insureds under Elite's policy, but only to the extent their injuries were "caused, in whole or in part" by acts or omissions of Elite or those acting on its behalf. Id. at 1032. Great Divide, on the other hand, who insured the Forty-Niners as well as the City of Santa Clara, refused to defend. Noting the potential of coverage for some defendants' independent liability for the assault (which would not be covered under the First Mercury policy), the Northern District found that Great Divide had an independent duty to defend and ordered it to pay one half of defense costs. Id. at 1039. After weighing the nature of the underlying claim and other equitable considerations, and citing to the potential that either insurer could be liable for damages sought in at least one cause of action, the court found an equal share allocation to be equitable. Id. at 1039-40.

The rationale of the First Mercury case applies equally here, and after exercising its discretion in weighing all the circumstances of this matter, the Court concludes that the most equitable approach for apportioning the defense costs American incurred in Sierra's defense is to split them equally with ICSOP.

### F.	Entitlement to Prejudgment Interest

Although the Court has decided to allocate Sierra's costs on an equal shares basis after weighing all relevant factors in the exercise of its discretion, that does not mean that American is entitled to prejudgment interest on the defense costs owed by ICSOP. Prejudgment interest in a diversity action like this one "is a substantive matter governed by state law." U.S. Fid. & Guar. Co. v. Lee Investments LLC, 641 F.3d 1126, 1139 (9th Cir. 2011). Under California Civil Code § 3287(a), such interest is available to a person or entity "entitled to recover damages certain, or capable of being made certain by calculation," with the right to recover vested upon a particular day. The "certainty of damages" requirement under the statute depends on 1) whether the debtor knows the amount owed or 2) would be able to compute the damages. St. Paul Mercury, 210 Cal. App. 4th at 665 (quoting Fireman's Fund Ins. Co. v. Allstate Ins. Co., 234 Cal. App. 3d 1154, 1173 (1991). Damages are deemed certain "where there is essentially no dispute between the parties concerning the basis of computation of damages" if recoverable, with any dispute instead centering on the issue of liability giving rise to damage in the first place. Id.

The plaintiff insurer in St. Paul issued a comprehensive general liability policy to a general contractor, who was also an "other insured" under a policy issued by defendant Mountain West, who directly insured one of the subcontractors, Teton. Mountain West declined to provide a defense and, while St. Paul did so, it sued Mountain West for equitable contribution. Despite the fact that apportionment of the defense costs between Mountain West and St. Paul was not made until after trial, the trial court ordered Mountain West to pay prejudgment interest on the 43 percent of defense costs ultimately awarded to St. Paul. The Court of Appeal reversed, finding that Mountain West "was not

able to compute the damages and its share of the loss was not 'certain, or capable of being made certain by calculation,' until the trial court determined what method of allocation was most equitable." St. Paul Mercury, 210 Cal. App. 4th at 666. Consequently, prejudgment interest, according to the St. Paul court, could not be awarded.

Here, as in St. Paul, this Court has been asked to choose the appropriate method of allocating defense costs. In doing so pursuant to its discretion, the Court alone makes the determination and until that time ICSOP cannot know, or accordingly compute, the amount of defense costs it owes. Accordingly, any award of prejudgment interest would be improper.

**CONCLUSION**

Based on all the foregoing, Plaintiff American States' Motion for Summary Judgment (ECF No. 182) as to its remaining claim for equitable contribution is GRANTED to the extent that the Court finds that American is entitled to equitable contribution from Defendant ICSOP in the amount of $6,613,957.28, or one half of the $13,227,914.56 American paid in defending Sierra Pacific Industries in the Moonlight Fire lawsuits. Judgment shall be entered in American States' favor accordingly.

American States' request for prejudgment interest on that award is, however, DENIED, as is ICSOP's own Motion for Summary Judgment (ECF No. 184) which argued for a reduced entitlement to contribution.

The matter having now been concluded in its entirety, the Clerk of Court is directed to close the file.

IT IS SO ORDERED.

Dated: March 29, 2018

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE